And that is In Re SCH Corporation, CFI Class Action Claimants as Appellants. The bell was not the Get Started bell, just to let you know. Is it Mr. Acklesburg? It is, Your Honor.  Good morning, Mr. Acklesburg. I represent the Appellant CFI Creditors with the permission of the Court. I would like to reserve three minutes of my time for rebuttal, and I would also like, if the Court permits, to start by addressing the relationship between this appeal and the earlier appeal in the same case that another panel of this Court recently reversed and remanded. Both appeals stem from a consolidated proceeding in the Bankruptcy Court. Has there been any activity on the remand? None, Your Honor. Okay. The two motions were tried together and ruled on together, but then unfortunately the District Court separated the two, denying our motion to keep the matters consolidated and forcing us to kind of follow the track that these cases have followed. Now, the first of the motions, which is the one that was previously reversed and remanded, in that motion the creditor group was seeking sanctions against Levine Lightman, the plan sponsor and funder, and the estate's fiduciary, Mr. Singley, for alleged concerted action by the two that was contrary to the plan, the bankruptcy code, and injurious to the CFI group's interest. The second motion was Mr. Singley's motion seeking court approval of a bilateral agreement he made with Levine Lightman extending the plan funding obligations for an additional three years. It was the first of those matters, as I said, that was the subject of the June decision, reversing the District Court's dismissal of the appeal on equitable mootness grounds and directing her to reconsider the case. Whatever this panel decides with regard to this appeal, it should be cognizant obviously of what the District Court has already been ordered to reconsider, deciding only what needs to be decided with regard to the narrow issues presented here to the extent possible without reaching questions that the District Court has yet to reach in the first instance. And I'm going to give two examples, and these are both important issues in this appeal, and explain how the court can essentially follow that framework and only decide what needs to be decided here. The first is our claim that this settlement agreement could not be approved under a fairness standard because it was not the product of arm's-length negotiations. Now, both of the two halves of this case involve questions about the relationship between Mr. Singley and the plan sponsor and funder, Levine Lightman, and its subsidiary, NCG. If the settlement's not approved, we go back to the original confirmed plan and $200,000 a year subject to offsets. That's exactly right, Your Honor. That's exactly right. And what would happen in a remand is that that piece of the case, assuming that this court determines, as we believe it should, it is a matter of law, that this agreement could not have been approved as fair and equitable to the creditors. That was a modification. Pardon? That was a modification. Well, that's certainly one reason. If you turn a five-year plan payment obligation into an eight-year payment obligation, that's a modification of the plan, and the code has very specific requirements about what's supposed to happen. You're supposed to follow, you're supposed to treat it. Even assuming you pass the substantial consummation condition in 1127B, you would still have to determine that this was in good faith. They're extending this for three more years. Judge Robinson said you raised it only in passing in the appeal. She addressed it in the final footnote of her opinion and said that it had not been raised really before the bankruptcy court. She did say that, Your Honor. First, I have to say that we did raise it. All you have to do is look at the objection, what the court was deciding. Paragraph 13 of our objections, it's in the appendix at page 77A. We did raise it, and because of that footnote, we filed a motion for a rehearing under Bankruptcy Rule 8015, pointing out to the court that this is not a new issue. This was in the case from the beginning. We showed it to her, and then she denied the motion for a rehearing, saying, well, I dealt with that issue in the footnote. So, yes, Your Honor, the position of this court, as you know, vis-à-vis a bankruptcy appeal is that you're effectively looking at the merits in the first instance, and we raised it. It's there, right for Your Honors to see at page 77A, and it was a, there was no question, it was an impermissible consolidation, a modification. It also, Your Honor, was a, just looked at within the ordinary framework of settlements that are supposed to be reviewed by courts for their fairness to the non-settling parties. There is no way that this settlement could have been approved. And again, going back to what I said before, to distinguish between the narrow issue that this court can be, that we're asking this court to reach in this case, as opposed to the broader issue that has yet to be decided, you don't have to determine whether the relationship between the two was so egregious that the fiduciary obligations of Mr. Singley had been so impaired such that we should get sanctions for what happened. That's what's happening in the other half of this case that Judge Robinson hopefully will decide on the merits. All that you have to decide is that for purposes of approving this as a fair and equitable settlement to the non-settling parties, there's no way that you could say that they have an arm's length, that this was an arm's length negotiation. That's the narrow question you have to look at in terms of the relationship between the negotiating parties. How could it be arm's length if Mr. Singley's firm still had an ongoing undisclosed attorney-client relationship with the party that it's negotiating with? It's effectively negotiating with itself. So those are the three reasons in which the bankruptcy court abused its discretion. First, this was not an arm's length agreement. There was no basis for treating it as such. The views of the dissenting creditors should have been deferred to. In fact, I refer the court to the Fifth Circuit case in foster mortgage. I'm having trouble with this. I looked at this and wanted to describe this case as the proverbial dog's breakfast. There's so much going on that there's something beneath the papers that is going on, and I'm trying to figure out exactly what that is because if you set aside the settlement, you could end up with less. Actually, Your Honor, I don't think that's true. I mean, it's possible, but if Your Honor would like, there's time remaining. I can take you through the arithmetic here. There are three things you said. Yes. I never got to the theory. I think you only said two. What was the third? The first, okay, the third one was what we already discussed with Judge Cowen, that this was an impermissible modification as a matter of the bankruptcy. Let me ask you this question. In your theory, if you're right on any of the three, we should reverse. Yes. So what you're saying, in effect, is we could write a one-page opinion here and say that it was not an arm's-length deal because of the, what you would call, conflict of interest. Therefore, we reverse. We would be satisfied with that, Your Honor. That would give the relief you want. Yes, and just to – absolutely. But just to get to the sort of practicalities here, I mean, what we're looking for, this portion of the case would ultimately, if you reverse on that, would ultimately have to go back to Judge Shannon in Delaware Bankruptcy Court for him to determine what he basically decided he wasn't going to decide, which was how much did Levine-Leichman owe under the plan that was confirmed, not some new plan that the parties have bilaterally agreed to. What should they have paid? And then who should get that little bit of money that's there? You're right, Judge. At the end, there's very little here. There's a very – I can't understand this case because it seems to me there's so much being spent here over a very small pot. I mean, maybe I'm wrong. Your Honor, the backdrop of this case, which I'm sure will explain a lot of the emotion surrounding this, Your Honor, our firm hasn't seen a dime in this case. In the end, this is not a case about dollars and cents, other than the little bit that will be, we hope, rearranged in the crumbs that are left at the end of this case. Remember what happened here. Our clients are the 900,000 consumers in three states who received letters from the debtor on the letterhead of a district attorney telling them that if they didn't pay the debt and $200 and thereabouts in extra fees, they face arrest, prosecution, and possible imprisonment, and no DA had ever looked at this case. And this business is three – so we had class actions. We're really the only creditor class. There were class actions pending. The bankruptcy was filed purely to stop the class actions, avoid the legal determinations that were about to happen. The day after the bankruptcy was filed, there was a summary judgment motion on the merits pending in the Florida case. And two months later, the business is sold for no cash to the secured creditor, who then keeps at it with the business, agrees to pay a little bit of money to resolve the case. I had no idea that things like this went on, actually, those district attorney letters. I thought the district attorney was supposed to prosecute cases. Your Honor, this practice is – you know, I don't have – as you can see, Your Honor, this is something I'm fairly emotional about. I think it's an outrage that this business has gone on as long as it has. As I advised the court in the 20HA letter, the ABA standing committee has just issued a rule in November that this whole business, where the DA essentially rents its badge, violates the model rules in two ways. And we're very hopeful that in the not-too-distant future, we will see an end to this kind of business. But in the meantime, we're left to pick up the little bit that remains of the efforts of the CFI class to get a little bit of justice here. Thank you. They'll get one cent each. Pardon? They'll get one cent each. It's $900,000. Well, actually, to be perfectly frank with you, Your Honor, I mean, it was our view, as we've said in the papers over and over again, that it was never any – there was never any expectation that the money that Levine-Lytton was paying, however much the set-off, whatever the real amount of money, whether it was $700,000 or $300,000, whatever it was, it never would have been enough to produce a distribution to the class. And it's for that reason that the main interest that we articulated time and time again to the court, and the court did acknowledge in its ruling, I'm referring to the bankruptcy court, was the right to preserve – was our ability to continue the legal fight, to continue to challenge the legality of this business with the new company, with the secured creditor. The plan originally would have released Levine-Lytton from such lawsuits. Through our efforts, we were able to prevent that from happening. We reached agreement on a consensual plan that we thought established a temporary truce that gave the CFI class and its counsel limited rights, a 90% stake in whatever happened to be there, and the right to proceed with new lawsuits against the new company. It's the fact that things happened after – And you got disqualified from those lawsuits. Well, we got disqualified, and then they basically – it's really not that disqualification. That's done and gone. That's basically history now. We can't do anything about that, but what we can do, Your Honor, is protect the integrity of the bankruptcy process and what's left to this – as Your Honor said, what's left is a very small case, but it's in the context of a very important issue of great public import. Thank you. Thank you very much. Mr. McLaughlin? Good morning, Your Honor. May it please the Court, Jack McLaughlin of C.R.A.T.S. I didn't ask him. On behalf of Carl Sengly, who is the responsible officer appointed pursuant to the plan, with me is Anthony Amsakul, Esquire of AMSAKUL Legal, who is on the brief with us and is the brains behind the operation. Your Honor, I don't want to squander my 15 minutes going too deeply into the background of a confirmed bankruptcy case. I'm obviously happy to discuss the background, but we're not here today to discuss whether or not the collection efforts of this entity are appropriate. That's a matter for class action courts or courts otherwise. This is a relatively simple, straightforward bankruptcy issue on a Rule 9019 – approval of Rule 9019 settlement. The matters on remand in the other appeal that we had, the matters that are before the district judge now, are they related at all to the issues before us? Can you hold this matter in abeyance? Your Honor, as I said, the law is a seamless web, and this was tried on a consolidated basis. So we had a three-day trial with witnesses and exhibits and all that, and we all by agreement agreed that the judge would take the evidence as a law. The issues on remand, Mr. Acklesberg had moved to dismiss the case on some fairly creative theories, including bad faith. Judge Shannon denied that motion to dismiss. Again, we're talking about a post-confirmation case, several years post-confirmation, so it's a relatively odd duck even in the world of bankruptcy. The matter was briefed at the district court level on several theories, including constitutional and equitable mootness. The court actually accepted the argument on equitable mootness and dismissed on that basis. Of course, that is a very key issue to this court, particularly Judge Ambrose, and Mr. Acklesberg brought the matter up before the court, and ultimately after oral argument the matter was remanded for Judge Robinson to determine whether or not equitable mootness was, in fact, an appropriate basis for dismissal. That matter has never been listed. There's nothing that's happened since it got remanded, so it's just sitting there. With regard to this particular case, again, we view this as a very, very simple Rule 9019 settlement. Mr. Acklesberg has spun it into a very complex situation going back years and years and years, and, of course, enveloping district attorneys across the country. If you think this is a simple case, we'd better change places. And, Your Honor, that's why I'm here is to try and convince you that this part of it really is simple. Well, you have a settlement here, but the bankruptcy judge said that he did what he thought he conducted a less than rigorous review of the settlement, and it appears to me that is not what's called for in this settlement. Well, no, Your Honor, I respectfully disagree. That's what he said. The standards are set forth in Nutrient Questions Court, which, of course, adopts the earlier Martin factors, which go back to a case in 1929. The factors for determining whether or not a matter should be settled or can be settled. Or it's a plan modification. Well, the plan modification is a different argument. That was not really ever addressed at the trial level. As was noted earlier, it was addressed only in passing at the district court level because it was not raised by the ad plants. We respectfully suggest that this is not a plan modification. Well, that's your position, but I don't know whether it well may be a plan modification. Well, Your Honor, that matter was not raised at the trial level, and so. But the bankruptcy judge didn't give it enough scrutiny to really determine exactly. I don't believe he was asked to give that scrutiny, Your Honor. He's not asked to give that scrutiny. This was played as a 90-19, and we view it as such. I want to point out, Your Honor, that the original plan, as confirmed and as supported by my colleague here, was a five-year plan. We have received payments for that five-year period. What occurred at the end was that there was a dispute over one matter, and that was whether or not the plan funder was entitled to accept or to take offsets from his payments for expenses that were covered by his own insurance policy or its own insurance policy. And that was the issue. We didn't ask to extend the plan, per se. When the issue came up, we argued, we went back and forth, and determined that rather than try and litigate this where we, quite frankly, Your Honor, we would not be able to litigate it. It is just too expensive, too complicated for this estate. This is a very small estate, as Judge Reber has pointed out. There's not a whole lot of money here, and sadly, a lot of it is now being spent coming to visit the Third Circuit for a second time. So the bottom line is the responsible officer agreed to accept a certain amount of money, including $18,000 for part of the fifth payment, which brought our five-year payments current. And in addition, there would be a minimum $25,000 for another three-year period, up to a possible $100,000. Well, according to your adversary, how could any court possibly have determined that there was an ARVILX transaction that had taken place when one side is represented by a law firm that previously represented the other side in the same proceeding? You continue to represent the other side in unrelated matters and agreed not to disclose privileged and confidential information, even not to file any limitation against the opposing side. It seems to me there's a real conflict of interest in this whole case. Right. Again, we respectfully suggest that, as Judge Shannon found, that the engagement and the waivers are not unremarkable. You don't think that's wrong? You think that's usual? Yes, Your Honor, I do, as a matter of fact. Let me address one thing. The court has stated that there's an ARVILX requirement. That's really not a per se requirement in a 1919 settlement. Well, there's a settlement here, and you've got to know whether both sides brought ARVILX negotiation to that settlement. And when you have people negotiating the settlement that don't have conflicts of interest. But, Your Honor, the conflicts were waived when this plan was confirmed. The conflicts were waived? Yes, Your Honor, before I finish. When the plan was confirmed, the engagement of Dean Singley was part of the plan. The engagement letter is part of the plan. In there he indicates that he will be retaining the CRD firm as his counsel and that in the event any sort of disqualifying event came up for us, that he would obtain conflicts counsel, which, again, is very common in the world of bankruptcy. It is also very common, Your Honor, in the world of bankruptcy, that big firms represent big banks, big banks are involved in many cases. There are many, many, many situations where there are representations of parties in unrelated matters. And those are all subject to disclosure in a bankruptcy under Rule Section 327 under Rule 2014. This is a post-confirmation case, so Section 327 and Rule 2014 do not apply. When we executed, when we were originally engaged, again, that was part of a plan that Mr. Acklesberg, his folks supported. There was actually a plan support agreement that was signed. So they knew about it, they agreed to it. When we had ultimately, as it came time to bring the adversary litigation for preferences, we went and got an engagement or a waiver letter both from Dean Singley and from the other side, NCG and LLCP, indicating that they consented subject to we couldn't sue them, which is not uncommon, and that would be standard under any non-bankruptcy ethical rules. And that there would be, you know, we'd safeguard confidential information, of which we didn't have any. In the post-confirmation period, our engagement, our representation of LLCP, such as it was, ended upon effective date of the plan when we became. It's the most important thing is whether the settlement was in the best interest of the creditors, correct?  That's absolutely correct, Your Honor. I don't see that the bankruptcy judge took that as his main focus for determining whether the settlement should be approved. Your Honor, I believe he did. Judge Shannon looked at the numbers, and quite frankly, this is a case of more money is better than less money. That may not always be the best settlement. Not necessarily so. That's for the creditors. Your Honor, actually, I would respectfully suggest that it is here. And also, I'd ask the court to consider one thing. Mr. Acklesberg, in his argument here, is representing a particular subset of unsecured creditors. He was not counsel on unsecured creditors committee. His fiduciary duties do not run to the entire body of creditors. And this is, as Judge Shannon pointed out in his oral opinion, there is, as the court is well aware, there's a waterfall of priorities for payment in a bankruptcy. We have unpaid Chapter 11 administrative expenses. We have unpaid post-confirmation Chapter 11 administrative expenses. There may be a couple of priority claims out there, although we think we scrubbed the claims register pretty well. And then there's a group of unsecured creditors who are not members of the CFI class. So Mr. Acklesberg is only speaking from one tiny little parochial group. The deal that Dean Singley made that brings in up to possibly another $318,000 would be shared by all general unsecured creditors, or all creditors pro rata, according to their interest under the Bankruptcy Code. It's not just his folks. And we do have, there are other proofs of claim filed by other general unsecured creditors. So the fact that he gets 90% of the pot, which is a relatively unusual plan, but it's what the plan is, that's fine, but that doesn't mean that he stands as a fiduciary for all these other folks. My client, Dean Singley, is the only one who acts as a fiduciary for the entire body of creditors under this plan. There's no suggestion, Mr. Acklesberg has suggested that we are representing actively LLCP or NCG during the period of this negotiation, and that's not true. We very briefly represented LLCP in some matter in the middle district in the immediate post-confirmation period, and we rapidly got out of that. So do you agree that the money received by the estate and creditors while critical, may that always be the only consideration relevant to assessing whether the settlement is in the paramount interest of the creditors? No, Your Honor, I don't think the law is ever that simple, black and white. But in this particular case, bankruptcy is about dollars and cents. Mr. Acklesberg has suggested that it's about more than that. Well, no, actually it's not. This bankruptcy, the confirmed plan that he supported provided for certain payments. It is not my client's role, it's not the bankruptcy court's role to go out and police questionable collection practices, if in fact they are questionable. I don't know. It's just none of our business. So if we were to disagree with the district court and send the matter back, you'd have to litigate the offset issue. Your Honor, if I may be perfectly candid, that's not going to happen. As I said on the record during the trial, my firm will not litigate. It's simply not worth it. Obviously, we would not be able to do so because of the prohibition against suing them directly, but we wouldn't do it anyway. It's just not worth it. If I may speculate, if you remand or reverse and remand, I will go back to Dean Sangley and make my report. As he noted in his testimony at trial, he just doesn't think this is worth a whole lot more. There's not that much money left in the estate. So I would respectfully suggest that what's going to happen is that either that, we'll just call it a day, game over. If the payor permits us to retain what was given, which we think they should because it's at least that much that was due, and I would speculate that they will, then we would just walk away. There's already been a final decree in this case. This case was finally decreed over a year ago just to get it off the books administratively. You know, I'm sitting here wondering, the case got settled once. Isn't there some way that everybody can sit down and end this? I mean, to me the whole thing is a little crazy, what's going on here. And you just explained why. Your Honor, no truer words were ever spoken. Well, that's a start. Here's the problem. In the opening brief for the Appellants, they indicate this is a three-party dispute. CFI claimants, NCG, and the estate. There's actually a fourth party. And this is where the truth lies. Mr. Acklesberg's firm and his affiliate counsel who were prosecuting the class actions want to remain as class action counsel in the speculative future cases that may arise. I don't know if there are any out there or not. But unfortunately, as the Court knows, or unfortunately for Mr. Acklesberg, after in the post-confirmation period in the Del Campo case pending in California and the Smith case pending in California, they were disqualified based upon what I understand is a relatively harsh California ethical rule with regard to conflicts. That precluded them from representing. And the basis of that was that for every dollar that was spent defending the Smith case, which is the second file case, that would come out of the Del Campo pocket. So there was an inherent conflict. The two, the United States District Courts of California plus the Ninth Circuit, basically said, yeah, there's a conflict and you're out. Of course, what Mr. Acklesberg and his colleagues are worried about is that if they would wish to sue in wherever, that the same type of claim could be raised. Now, these speculative future suits in places unknown may or may not involve any members of the Del Campo class. But it is true that if, as long as there's money coming into the Del Campo, the CFI, to my estate, SCH, it will be offset by any costs that the NCG, the plan funder, has to expend to defend. So, yes, I mean, it's Mr. Acklesberg, you know, is disqualified, and I'm sorry for that. It's not, that's not the bankruptcy court's business. We didn't disqualify him. If you look at the plan, there's nothing in the plan, there's nothing in anything in the bankruptcy that says that NCG cannot be sued for the same type of violations. And, in fact, when Mr. Acklesberg and Mr. Ahrens et al. were disqualified, the litigants found competent counsel, and, in fact, Del Campo got settled and decertified. Smith got settled. Those cases have pretty much gone away, which raises an issue as to whether or not whose clients really are at this point. But that's, I'm sorry, I'm running out of time, Your Honor. It's all perfectly clear. May I help? May I elaborate in any fashion for you, Your Honor? Please don't. Thank you very much, Your Honor. Okay. Thank you. The judge may ask you to the first question early on that you asked of my opponent, whether we should just hold this in abeyance. I just wanted to respond to that. Absolutely not. Because, remember, I think we can presume that Judge Robinson is waiting to hear what this court says with regard to the half of the case that was resolved on the merits. And I think that that really needs to be decided, and we have no doubt that it will inform her as to how. Was it one of the considerations on whether there's a modification to the plan, whether there's been substantial consummation of the plan? Yes, that's the first. It's a two-step process. You first have to, under 1127A, B, first they would have to show that the plan had not been substantially consummated, which is the opposite of what they argued in the equitable mootness context in the other half. And then, even assuming it were not substantially consummated, that they would have to then essentially go through a new confirmation process. You would have to show that it had not been substantially consummated. You're the one claiming modification. Yeah, I mean, we would have to show that. Now, on the point of, you know, again, I mentioned in the record where we raised it, in the objection to this motion, I said it was Paragraph 13. I looked. It's actually Paragraph 14 where I say, specifically, the proposed three-year extension of the plan is, in effect, a proposed post-confirmation request to modify the plan. And I go on and discuss 1127. He mentioned that there's no problem here because, under the terms of his appointment, he was, Mr. Singley was, all he had to do was to get conflicts counsel. Well, right. But as we questioned him at the hearing, and this is the way it went, and on cross-examination, Mr. Singley testified, I don't believe there was a conflict, so I didn't interpret the language to require that I obtain conflicts counsel. So the conflict was there, and he didn't even do what he was supposed to do under the circumstances. The last thing I want to say, Your Honor, is, and again, this is putting the case in context. Yes, in a lot of ways, this bankruptcy is about dollars and cents. I would recommend to the court to look at the final report that was filed in this case. It starts at 218A of the appendix, and it describes how before the case was even confirmed, the debtor that ceased to exist two months into the case, the debtor's counsel received $1.6 million in funds pre-confirmation. That doesn't count the money that came off the million dollars that was advanced pursuant to this asset purchase agreement, and that the money that has, in fact, been collected under the agreement, has now been distributed to Mr. Singley, his law firm, and their professionals. Yes, it is about dollars and cents. It's a question of what is this case really about? And I would leave this court with the fact that the Delaware Bankruptcy Court hears an enormous number of this nation's bankruptcy cases, and very often there are cases where a business files and there are consumers all around the country with very little opportunity to do anything about it. This case presents a very stark picture about what some of those cases look like, and I would ask the court to consider that, and the importance of this court weighing in on matters affecting the integrity of the bankruptcy process. Thank you very much. Thank you. Thank you, Willard. Your case will take it under investigation.